# PATTERSON *v.* NEW YORK

No. 75–1861.   Argued March 1, 1977—Decided June 17, 1977

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and STEVENS, JJ., joined.   POWELL, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 216.   REHNQUIST, J., took no part in the consideration or decision of the case.

*Victor J. Rubino* argued the cause for appellant.   With him on the briefs was *Betty D. Friedlander*.

*John M. Finnerty* argued the cause for appellee.   With him on the brief was *Alan D. Marrus*.

Mr. Justice White delivered the opinion of the Court.

The question here is the constitutionality under the Fourteenth Amendment's Due Process Clause of burdening the defendant in a New York State murder trial with proving the affirmative defense of extreme emotional disturbance as defined by New York law.

I

After a brief and unstable marriage, the appellant, Gordon Patterson, Jr., became estranged from his wife, Roberta. Roberta resumed an association with John Northrup, a neighbor to whom she had been engaged prior to her marriage to appellant. On December 27, 1970, Patterson borrowed a rifle from an acquaintance and went to the residence of his father-in-law. There, he observed his wife through a window in a state of semiundress in the presence of John Northrup. He entered the house and killed Northrup by shooting him twice in the head.

Patterson was charged with second-degree murder. In New York there are two elements of this crime: (1) "intent to cause the death of another person"; and (2) "caus[ing] the death of such person or of a third person." N. Y. Penal Law § 125.25 (McKinney 1975).[1] Malice aforethought is not an element of the crime. In addition, the State permits a person accused of murder to raise an affirmative defense that he "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse."[2]

---

[1] References herein to the charge of "murder" under New York law are to this section. Cf. N. Y. Penal Law § 125.27 (McKinney 1975) (murder in the first degree).

[2] Section 125.25 provides in relevant part:

"A person is guilty of murder in the second degree when:

"1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative defense that:

"(a) The defendant acted under the influence of extreme emotional

New York also recognizes the crime of manslaughter. A person is guilty of manslaughter if he intentionally kills another person "under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance." [3] Appellant confessed before trial to killing Northrup, but at trial he raised the defense of extreme emotional disturbance.[4]

The jury was instructed as to the elements of the crime of murder. Focusing on the element of intent, the trial court charged:

"Before you, considering all of the evidence, can convict this defendant or anyone of murder, you must believe and decide that the People have established beyond a reasonable doubt that he intended, in firing the gun, to kill

disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] Section 125.20 (2), N. Y. Penal Law § 125.20 (2) (McKinney 1975), provides:

"A person is guilty of manslaughter in the first degree when:

.        .        .        .

"2. With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25. The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subdivision."

[4] Appellant also contended at trial that the shooting was accidental and that therefore he had no intent to kill Northrup. It is here undisputed, however, that the prosecution proved beyond a reasonable doubt that the killing was intentional.

either the victim himself or some other human being. . . .

.        .        .        .        .

"Always remember that you must not expect or require the defendant to prove to your satisfaction that his acts were done without the intent to kill. Whatever proof he may have attempted, however far he may have gone in an effort to convince you of his innocence or guiltlessness, he is not obliged, he is not obligated to prove anything. It is always the People's burden to prove his guilt, and to prove that he intended to kill in this instance beyond a reasonable doubt." App. A70–A71.[5]

The jury was further instructed, consistently with New York law, that the defendant had the burden of proving his affirmative defense by a preponderance of the evidence. The jury was told that if it found beyond a reasonable doubt that appellant had intentionally killed Northrup but that appellant had demonstrated by a preponderance of the evidence that he had acted under the influence of extreme emotional disturbance, it had to find appellant guilty of manslaughter instead of murder.

The jury found appellant guilty of murder. Judgment was entered on the verdict, and the Appellate Division affirmed. While appeal to the New York Court of Appeals was pending, this Court decided *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), in which the Court declared Maine's murder statute unconstitutional. Under the Maine statute, a person accused of murder could rebut the statutory presumption that he com-

---

[5] The trial court's instructions to the jury focused emphatically and repeatedly on the prosecution's burden of proving guilt beyond a reasonable doubt.

"The burden of proving the guilt of a defendant beyond a reasonable doubt rests at all times upon the prosecution. A defendant is never obliged to prove his innocence.

"Before you can find a defendant guilty, you must be convinced that each and every element of the crime charged and his guilt has been established to your satisfaction by reliable and credible evidence beyond a reasonable doubt." App. A48–A49.

mitted the offense with "malice aforethought" by proving that he acted in the heat of passion on sudden provocation. The Court held that this scheme improperly shifted the burden of persuasion from the prosecutor to the defendant and was therefore a violation of due process. In the Court of Appeals appellant urged that New York's murder statute is functionally equivalent to the one struck down in *Mullaney* and that therefore his conviction should be reversed.[6]

The Court of Appeals rejected appellant's argument, holding that the New York murder statute is consistent with due process. 39 N. Y. 2d 288, 347 N. E. 2d 898 (1976). The Court distinguished *Mullaney* on the ground that the New York statute involved no shifting of the burden to the defendant to disprove any fact essential to the offense charged since the New York affirmative defense of extreme emotional disturbance bears no direct relationship to any element of murder. This appeal ensued, and we noted probable jurisdiction. 429 U. S. 813 (1976). We affirm.

## II

It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government, *Irvine* v. *California,* 347 U. S. 128, 134 (1954) (plurality opinion), and that we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. Among other things, it is normally "within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion," and its decision in this regard is not subject to proscription

---

[6] In *Hankerson* v. *North Carolina, post,* p. 233, we hold, as did the New York Court of Appeals in the present case, that *Mullaney* is to be applied retroactively. The fact that Patterson was tried prior to our decision in *Mullaney* does not insulate this case from the principles of *Mullaney.*

under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Speiser* v. *Randall*, 357 U. S. 513, 523 (1958); *Leland* v. *Oregon*, 343 U. S. 790, 798 (1952); *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934).

In determining whether New York's allocation to the defendant of proving the mitigating circumstances of severe emotional disturbance is consistent with due process, it is therefore relevant to note that this defense is a considerably expanded version of the common-law defense of heat of passion on sudden provocation and that at common law the burden of proving the latter, as well as other affirmative defenses—indeed, "all . . . circumstances of justification, excuse or alleviation"—rested on the defendant. 4 W. Blackstone, Commentaries *201; M. Foster, Crown Law 255 (1762); *Mullaney* v. *Wilbur, supra,* at 693–694.[7] This was the rule when the Fifth Amendment was adopted, and it was the American rule when the Fourteenth Amendment was ratified. *Commonwealth* v. *York,* 50 Mass. 93 (1845).[8]

In 1895 the common-law view was abandoned with respect to the insanity defense in federal prosecutions. *Davis* v. *United States,* 160 U. S. 469 (1895). This ruling had wide impact on the practice in the federal courts with respect to the burden of proving various affirmative defenses, and the prose-

---

[7] See also F. Wharton, A Treatise on the Law of Evidence in Criminal Issues 240–269 (9th ed. 1884); H. Kelley, Criminal Law and Practice 124–128, 131 (1876); Fletcher, Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases, 77 Yale L. J. 880, 882–884 (1968); Note, Affirmative Defenses After *Mullaney* v. *Wilbur:* New York's Extreme Emotional Disturbance, 43 Brooklyn L. Rev. 171, 190 (1976).

[8] *York,* which relied on American authorities dating back to the early 1800's, confirmed that the common-law and prevailing American view was that the burden was on the defendant to prove provocation. *York* is said to have governed a half century of American burden-of-proof decisions in provocation and self-defense cases. Fletcher, *supra,* n. 7, at 903–904.

cution in a majority of jurisdictions in this country sooner or later came to shoulder the burden of proving the sanity of the accused and of disproving the facts constituting other affirmative defenses, including provocation. *Davis* was not a constitutional ruling, however, as *Leland* v. *Oregon, supra,* made clear.[9]

---

[9] Meanwhile, the Court had explained that although the State could go too far in shifting the burden of proof to a defendant in a criminal case, the Due Process Clause did not invalidate every instance of burdening the defendant with proving an exculpatory fact. In *Morrison* v. *California,* 291 U. S. 82 (1934), a state law made it illegal for an alien ineligible for citizenship to own or possess land. Initially, in a summary dismissal for want of a substantial federal question, *Morrison* v. *California,* 288 U. S. 591 (1933), the Court held that it did not violate the Due Process Clause for the State to place on the defendant "the burden of proving citizenship as a defense," 291 U. S., at 88, once the State's evidence had shown that the defendant possessed the land and was a member of a race barred from citizenship. In the later *Morrison* case the Court reiterated and approved its previous summary holding, even though it struck down more drastic burden shifting permitted under another section of the statute. The Court said that its earlier *per curiam* ruling "was not novel":

"The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression. Cf. Wigmore, Evidence, Vol. 5, §§ 2486, 2512 and cases cited. Special reasons are at hand to make the change permissible when citizenship *vel non* is the issue to be determined. Citizenship is a privilege not due of common right. One who lays claim to it as his, and does this in justification or excuse of an act otherwise illegal, may fairly be called upon to prove his title good." *Id.,* at 88–89.

In ruling that in the other section of the statute then at issue the State had gone too far, the Court said:

"For a transfer of the burden, experience must teach that the evidence

At issue in *Leland* v. *Oregon* was the constitutionality under the Due Process Clause of the Oregon rule that the defense of insanity must be proved by the defendant beyond a reasonable doubt. Noting that *Davis* "obviously establish[ed] no constitutional doctrine," 343 U. S., at 797, the Court refused to strike down the Oregon scheme, saying that the burden of proving all elements of the crime beyond reasonable doubt, including the elements of premeditation and deliberation, was placed on the State under Oregon procedures and remained there throughout the trial. To convict, the jury was required to find each element of the crime beyond a reasonable doubt, based on all the evidence, including the evidence going to the issue of insanity. Only then was the jury "to consider separately the issue of legal sanity *per se* . . . ." *Id.*, at 795. This practice did not offend the Due Process Clause even though among the 20 States then placing the burden of proving his insanity on the defendant, Oregon was alone in requiring him to convince the jury beyond a reasonable doubt.

In 1970, the Court declared that the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U. S.

---

held to be inculpatory has at least a sinister significance (*Yee Hem* v. *United States*, [268 U. S. 178 (1925)]; *Casey* v. *United States* [276 U. S. 413 (1928)]), or if this at times bo lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception. Greenleaf, Evidence, Vol. 1, § 79." *Id.*, at 90–91.

The Court added that, of course, the possible situations were too variable and that too much depended on distinctions of degree to crowd them all into a simple formula. A sharper definition was to await specific cases. Of course, if the *Morrison* cases are understood as approving shifting to the defendant the burden of disproving a fact necessary to constitute the crime, the result in the first *Morrison* case could not coexist with *In re Winship*, 397 U. S. 358 (1970), and *Mullaney*.

358, 364 (1970). Five years later, in *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), the Court further announced that under the Maine law of homicide, the burden could not constitutionally be placed on the defendant of proving by a preponderance of the evidence that the killing had occurred in the heat of passion on sudden provocation. THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST, concurring, expressed their understanding that the *Mullaney* decision did not call into question the ruling in *Leland* v. *Oregon, supra,* with respect to the proof of insanity.

Subsequently, the Court confirmed that it remained constitutional to burden the defendant with proving his insanity defense when it dismissed, as not raising a substantial federal question, a case in which the appellant specifically challenged the continuing validity of *Leland* v. *Oregon.* This occurred in *Rivera* v. *Delaware,* 429 U. S. 877 (1976), an appeal from a Delaware conviction which, in reliance on *Leland,* had been affirmed by the Delaware Supreme Court over the claim that the Delaware statute was unconstitutional because it burdened the defendant with proving his affirmative defense of insanity by a preponderance of the evidence. The claim in this Court was that *Leland* had been overruled by *Winship* and *Mullaney.* We dismissed the appeal as not presenting a substantial federal question. Cf. *Hicks* v. *Miranda,* 422 U. S. 332, 344 (1975).

### III

We cannot conclude that Patterson's conviction under the New York law deprived him of due process of law. The crime of murder is defined by the statute, which represents a recent revision of the state criminal code, as causing the death of another person with intent to do so. The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are either presumed or inferred

in order to constitute the crime. The statute does provide an affirmative defense—that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation—which, if proved by a preponderance of the evidence, would reduce the crime to manslaughter, an offense defined in a separate section of the statute. It is plain enough that if the intentional killing is shown, the State intends to deal with the defendant as a murderer unless he demonstrates the mitigating circumstances.

Here, the jury was instructed in accordance with the statute, and the guilty verdict confirms that the State successfully carried its burden of proving the facts of the crime beyond a reasonable doubt. Nothing in the evidence, including any evidence that might have been offered with respect to Patterson's mental state at the time of the crime, raised a reasonable doubt about his guilt as a murderer; and clearly the evidence failed to convince the jury that Patterson's affirmative defense had been made out. It seems to us that the State satisfied the mandate of *Winship* that it prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [Patterson was] charged." 397 U. S., at 364.

In convicting Patterson under its murder statute, New York did no more than *Leland* and *Rivera* permitted it to do without violating the Due Process Clause. Under those cases, once the facts constituting a crime are established beyond a reasonable doubt, based on all the evidence including the evidence of the defendant's mental state, the State may refuse to sustain the affirmative defense of insanity unless demonstrated by a preponderance of the evidence.

The New York law on extreme emotional disturbance follows this pattern. This affirmative defense, which the Court of Appeals described as permitting "the defendant to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them," 39 N. Y. 2d, at 302, 347 N. E. 2d, at 907,

does not serve to negative any facts of the crime which the State is to prove in order to convict of murder. It constitutes a separate issue on which the defendant is required to carry the burden of persuasion; and unless we are to overturn *Leland* and *Rivera,* New York has not violated the Due Process Clause, and Patterson's conviction must be sustained.

We are unwilling to reconsider *Leland* and *Rivera.* But even if we were to hold that a State must prove sanity to convict once that fact is put in issue, it would not necessarily follow that a State must prove beyond a reasonable doubt every fact, the existence or nonexistence of which it is willing to recognize as an exculpatory or mitigating circumstance affecting the degree of culpability or the severity of the punishment. Here, in revising its criminal code, New York provided the affirmative defense of extreme emotional disturbance, a substantially expanded version of the older heat-of-passion concept; but it was willing to do so only if the facts making out the defense were established by the defendant with sufficient certainty. The State was itself unwilling to undertake to establish the absence of those facts beyond a reasonable doubt, perhaps fearing that proof would be too difficult and that too many persons deserving treatment as murderers would escape that punishment if the evidence need merely raise a reasonable doubt about the defendant's emotional state. It has been said that the new criminal code of New York contains some 25 affirmative defenses which exculpate or mitigate but which must be established by the defendant to be operative.[10] The Due Process Clause, as we see it, does not

---

[10] The State of New York is not alone in this result:

"Since the Model Penal Code was completed in 1962, some 22 states have codified and reformed their criminal laws. At least 12 of these jurisdictions have used the concept of an 'affirmative defense' and have defined that phrase to require that the defendant prove the existence of an 'affirmative defense' by a preponderance of the evidence. Additionally, at least six proposed state codes and each of the four successive versions of a

put New York to the choice of abandoning those defenses or undertaking to disprove their existence in order to convict of a crime which otherwise is within its constitutional powers to sanction by substantial punishment.

The requirement of proof beyond a reasonable doubt in a criminal case is "bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Winship,* 397 U. S., at 372 (Harlan, J., concurring). The social cost of placing the burden on the prosecution to prove guilt beyond a reasonable doubt is thus an increased risk that the guilty will go free. While it is clear that our society has willingly chosen to bear a substantial burden in order to protect the innocent, it is equally clear that the risk it must bear is not without limits; and Mr. Justice Harlan's aphorism provides little guidance for determining what those limits are. Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person. Punishment of those found guilty by a jury, for example, is not forbidden merely because there is a remote possibility in some instances that an innocent person might go to jail.

It is said that the common-law rule permits a State to

revised federal code use the same procedural device. Finally, many jurisdictions that do not generally employ this concept of 'affirmative defense' nevertheless shift the burden of proof to the defendant on particular issues." Low & Jeffries, DICTA: Constitutionalizing the Criminal Law?, 29 Va. Law Weekly, No. 18, p. 1 (1977) (footnotes omitted).

Even so, the trend over the years appears to have been to require the prosecution to disprove affirmative defenses beyond a reasonable doubt. See W. LaFave & A. Scott, Criminal Law § 8, p. 50 (1972); C. McCormick, Evidence § 341, pp. 800–802 (2d ed. 1972). The split among the various jurisdictions varies for any given defense. Thus, 22 jurisdictions place the burden of proving the affirmative defense of insanity on the defendant, while 28 jurisdictions place the burden of disproving insanity on the prosecution. Note, Constitutional Limitations on Allocating the Burden of Proof of Insanity to the Defendant in Murder Cases, 56 B. U. L. Rev. 499, 503–505 (1976).

punish one as a murderer when it is as likely as not that he acted in the heat of passion or under severe emotional distress and when, if he did, he is guilty only of manslaughter. But this has always been the case in those jurisdictions adhering to the traditional rule. It is also very likely true that fewer convictions of murder would occur if New York were required to negative the affirmative defense at issue here. But in each instance of a murder conviction under the present law, New York will have proved beyond a reasonable doubt that the defendant has intentionally killed another person, an act which it is not disputed the State may constitutionally criminalize and punish. If the State nevertheless chooses to recognize a factor that mitigates the degree of criminality or punishment, we think the State may assure itself that the fact has been established with reasonable certainty. To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate.[11]

---

[11] The drafters of the Model Penal Code would, as a matter of policy, place the burden of proving the nonexistence of most affirmative defenses, including the defense involved in this case, on the prosecution once the defendant has come forward with some evidence that the defense is present. The drafters recognize the need for flexibility, however, and would, in "some exceptional situations," place the burden of persuasion on the accused.

"Characteristically these are situations where the defense does not obtain at all under existing law and the Code seeks to introduce a mitigation. Resistance to the mitigation, based upon the prosecution's difficulty in obtaining evidence, ought to be lowered if the burden of persuasion is imposed on the defendant. Where that difficulty appears genuine and there is something to be said against allowing the defense at all, we consider it defensible to shift the burden in this way." ALI, Model Penal Code § 1.13, Comment, p. 113 (Tent. Draft No. 4, 1955).

Other writers have recognized the need for flexibility in allocating the burden of proof in order to enhance the potential for liberal legislative reforms. See, e. g., Low & Jeffries, supra, n. 10; Christie & Pye, Presump-

We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch. We therefore will not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here.

This view may seem to permit state legislatures to reallocate burdens of proof by labeling as affirmative defenses at least some elements of the crimes now defined in their statutes. But there are obviously constitutional limits beyond which the States may not go in this regard. "[I]t is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime." *McFarland* v. *American Sugar Rfg. Co.,* 241 U. S. 79, 86 (1916). The legislature cannot "validly command that the finding of an indictment, or mere proof of the identity of the accused, should create a presumption of the existence of all the facts essential to guilt." *Tot* v. *United States,* 319 U. S. 463, 469 (1943). See also *Speiser* v. *Randall,* 357 U. S., at 523–525. *Morrison* v. *California,* 291 U. S. 82 (1934), also makes the point with sufficient clarity.

---

tions and Assumptions in the Criminal Law: Another View, 1970 Duke L. J. 919, 933–938. See also Allen, *Mullaney* v. *Wilbur,* the Supreme Court, and the Substantive Criminal Law—An Examination of the Limits of Legitimate Intervention, 55 Texas L. Rev. 269 (1977).

Long before *Winship,* the universal rule in this country was that the prosecution must prove guilt beyond a reasonable doubt. At the same time, the long-accepted rule was that it was constitutionally permissible to provide that various affirmative defenses were to be proved by the defendant. This did not lead to such abuses or to such widespread redefinition of crime and reduction of the prosecution's burden that a new constitutional rule was required.[12] This was not the problem to which *Winship* was addressed. Nor does the fact that a majority of the States have now assumed the burden of disproving affirmative defenses—for whatever reasons—mean that those States that strike a different balance are in violation of the Constitution.[13]

---

[12] Whenever due process guarantees are dependent upon the law as defined by the legislative branches, some consideration must be given to the possibility that legislative discretion may be abused to the detriment of the individual. See *Mullaney* v. *Wilbur,* 421 U. S., at 698–699. The applicability of the reasonable-doubt standard, however, has always been dependent on how a State defines the offense that is charged in any given case; yet there has been no great rush by the States to shift the burden of disproving traditional elements of the criminal offenses to the accused.

[13] As Chief Judge Breitel cogently stated in concurring in the judgment and opinion below:

"A preliminary caveat is indicated. It would be an abuse of affirmative defenses, as it would be of presumptions in the criminal law, if the purpose or effect were to unhinge the procedural presumption of innocence which historically and constitutionally shields one charged with crime. Indeed, a by-product of such abuse might well be also to undermine the privilege against self-incrimination by in effect forcing a defendant in a criminal action to testify in his own ·behalf.

"Nevertheless, although one should guard against such abuses, it may be misguided, out of excess caution, to forestall or discourage the use of affirmative defenses, where defendant may have the burden of proof but no greater than by a preponderance of the evidence. In the absence of affirmative defenses the impulse to legislators, especially in periods of concern about the rise of crime, would be to define particular crimes in unqualifiedly general terms, and leave only to sentence the adjustment between offenses of lesser and greater degree. In times when there is also

## IV

It is urged that *Mullaney* v. *Wilbur* necessarily invalidates Patterson's conviction. In *Mullaney* the charge was murder,[14] which the Maine statute defined as the unlawful killing of a human being "with malice aforethought, either express or implied." The trial court instructed the jury that the words "malice aforethought" were most important because "malice

a retrogressive impulse in legislation to restrain courts by mandatory sentences, the evil would be compounded.

"The affirmative defense, intelligently used, permits the gradation of offenses at the earlier stages of prosecution and certainly at the trial, and thus offers the opportunity to a defendant to allege or prove, if he can, the distinction between the offense charged and the mitigating circumstances which should ameliorate the degree or kind of offense. The instant homicide case is a good example. Absent the affirmative defense, the crime of murder or manslaughter could legislatively be defined simply to require an intent to kill, unaffected by the spontaneity with which that intent is formed or the provocative or mitigating circumstances which should legally or morally lower the grade of crime. The placing of the burden of proof on the defense, with a lower threshold, however, is fair because of defendant's knowledge or access to the evidence other than his own on the issue. To require the prosecution to negative the 'element' of mitigating circumstances is generally unfair, especially since the conclusion that the negative of the circumstances is necessarily a product of definitional and therefore circular reasoning, and is easily avoided by the likely legislative practice mentioned earlier.

.　　　　.　　　　.　　　　.　　　　.

"In sum, the appropriate use of affirmative defenses enlarges the ameliorative aspects of a statutory scheme for the punishment of crime, rather than the other way around—a shift from primitive mechanical classifications based on the bare antisocial act and its consequences, rather than on the nature of the offender and the conditions which produce some degree of excuse for his conduct, the mark of an advanced criminology." 39 N. Y. 2d 288, 305–307, 347 N. E. 2d 898, 909–910 (1976).

[14] The defendant in *Mullaney* was convicted under Me. Rev. Stat. Ann., Tit. 17, § 2651 (1964), which provided:

"Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder and shall be punished by imprisonment for life."

aforethought is an essential and indispensable element of the crime of murder." Malice, as the statute indicated and as the court instructed, could be implied and was to be implied from "any deliberate, cruel act committed by one person against another suddenly . . . or without a considerable provocation," in which event an intentional killing was murder unless by a preponderance of the evidence it was shown that the act was committed "in the heat of passion, on sudden provocation." The instructions emphasized that " 'malice aforethought and heat of passion on sudden provocation are two inconsistent things'; thus, by proving the latter the defendant would negate the former." 421 U. S., at 686–687 (citation omitted).

Wilbur's conviction, which followed, was affirmed. The Maine Supreme Judicial Court held that murder and manslaughter were varying degrees of the crime of felonious homicide and that the presumption of malice arising from the unlawful killing was a mere policy presumption operating to cast on the defendant the burden of proving provocation if he was to be found guilty of manslaughter rather than murder—a burden which the Maine law had allocated to him at least since the mid-1800's.

The Court of Appeals for the First Circuit then ordered that a writ of habeas corpus issue, holding that the presumption unconstitutionally shifted to the defendant the burden of proof with respect to an essential element of the crime. The Maine Supreme Judicial Court disputed this interpretation of Maine law in State v. Lafferty, 309 A. 2d 647 (1973), declaring that malice aforethought, in the sense of premeditation, was not an element of the crime of murder and that the federal court had erroneously equated the presumption of malice with a presumption of premeditation.

"Maine law does not rely on a presumption of 'premeditation' (as Wilbur v. Mullaney assumed) to prove an essential element of unlawful homicide punishable as murder.

> Proof beyond a reasonable doubt of 'malice aforethought' (in the sense of 'premeditation') is not essential to conviction. . . . [T]he failure of the State to prove 'premeditation' in this context is not fatal to such a prosecution because, by legal definition under Maine law, a killing becomes unlawful and punishable as 'murder' on proof of 'any deliberate, cruel act, committed by one person against another, suddenly *without any, or without a considerable provocation.'* State v. Neal, 37 Me. 468, 470 (1854). *Neal* has been frequently cited with approval by our Court." *Id.,* at 664–665. (Emphasis added; footnote omitted.)

When the judgment of the First Circuit was vacated for reconsideration in the light of *Lafferty,* that court reaffirmed its view that Wilbur's conviction was unconstitutional. This Court, accepting the Maine court's interpretation of the Maine law, unanimously agreed with the Court of Appeals that Wilbur's due process rights had been invaded by the presumption casting upon him the burden of proving by a preponderance of the evidence that he had acted in the heat of passion upon sudden provocation.

*Mullaney's* holding, it is argued, is that the State may not permit the blameworthiness of an act or the severity of punishment authorized for its commission to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt.[15] In our view,

---

[15] There is some language in *Mullaney* that has been understood as perhaps construing the Due Process Clause to require the prosecution to prove beyond a reasonable doubt any fact affecting "the degree of criminal culpability." See, *e. g.,* Note, Affirmative Defenses After *Mullaney* v. *Wilbur:* New York's Extreme Emotional Disturbance, 43 Brooklyn L. Rev. 171 (1976); Note, Affirmative Defenses in Ohio After Mullaney v. Wilbur, 36 Ohio St. L. J. 828 (1975); Comment, Unburdening the Criminal Defendant: *Mullaney* v. *Wilbur* and the Reasonable Doubt Standard, 11 Harv. Civ. Rights–Civ. Lib. L. Rev. 390 (1976). It is said that such

the *Mullaney* holding should not be so broadly read. The concurrence of two Justices in *Mullaney* was necessarily contrary to such a reading; and a majority of the Court refused to so understand and apply *Mullaney* when *Rivera* was dismissed for want of a substantial federal question.

*Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of ·proof to the defendant by presuming that ingredient upon proof of the other elements of the offense. This is true even though the State's practice, as in Maine, had been traditionally to the contrary. Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.

It was unnecessary to go further in *Mullaney*. The Maine Supreme Judicial Court made it clear that malice aforethought, which was mentioned in the statutory definition of the crime, was not equivalent to premeditation and that the presumption of malice traditionally arising in intentional homicide cases carried no factual meaning insofar as premeditation was concerned. Even so, a killing became murder in Maine when it resulted from a deliberate, cruel act committed by one person against another, "suddenly without any, or without a considerable provocation." *State* v. *Lafferty, supra,* at 665. Premeditation was not within the definition of murder; but

---

a rule would deprive legislatures of any discretion whatsoever in allocating the burden of proof, the practical effect of which might be to undermine legislative reform of our criminal justice system. See Part II, *supra;* Low & Jeffries, *supra,* n. 10. Carried to its logical extreme, such a reading of *Mullaney* might also, for example, discourage Congress from enacting pending legislation to change the felony-murder rule by permitting the accused to prove by a preponderance of the evidence the affirmative defense that the homicide committed was neither a necessary nor a reasonably foreseeable consequence of the underlying felony. See Senate bill S. 1, 94th Cong., 1st Sess., 118 (1975). The Court did not intend *Mullaney* to have such far-reaching effect.

malice, in the sense of the absence of provocation, was part of the definition of that crime. Yet malice, *i. e.,* lack of provocation, was presumed and could be rebutted by the defendant only by proving by a preponderance of the evidence that he acted with heat of passion upon sudden provocation. In *Mullaney* we held that however traditional this mode of proceeding might have been, it is contrary to the Due Process Clause as construed in *Winship*.

As we have explained, nothing was presumed or implied against Patterson; and his conviction is not invalid under any of our prior cases. The judgment of the New York Court of Appeals is

*Affirmed.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

In the name of preserving legislative flexibility, the Court today drains *In re Winship,* 397 U. S. 358 (1970), of much of its vitality. Legislatures do require broad discretion in the drafting of criminal laws, but the Court surrenders to the legislative branch a significant part of its responsibility to protect the presumption of innocence.

## I

An understanding of the import of today's decision requires a comparison of the statutes at issue here with the statutes and practices of Maine struck down by a unanimous Court just two years ago in *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975).

## A

Maine's homicide laws embodied the common-law distinctions along with the colorful common-law language. Murder

was defined in the statute as the unlawful killing of a human being "with malice aforethought, either express or implied." Manslaughter was a killing "in the heat of passion, on sudden provocation, without express or implied malice aforethought." *Id.*, at 686, and n. 3. Although "express malice" at one point may have had its own significant independent meaning, see Perkins, A Re-Examination of Malice Aforethought, 43 Yale L. J. 537, 546–552 (1934), in practice a finding that the killing was committed with malice aforethought had come to mean simply that heat of passion was absent. Indeed, the trial court in *Mullaney* expressly charged the jury that "malice aforethought and heat of passion on sudden provocation are two inconsistent things." 421 U. S., at 686–687. And the Maine Supreme Judicial Court had held that instructions concerning express malice (in the sense of premeditation) were unnecessary. The only inquiry for the jury in deciding whether a homicide amounted to murder or manslaughter was the inquiry into heat of passion on sudden provocation. *State* v. *Lafferty*, 309 A. 2d 647, 664–665 (Me. 1973). See 421 U. S., at 686 n. 4.

Our holding in *Mullaney* found no constitutional defect in these statutory provisions. Rather, the defect in Maine practice lay in its allocation of the burden of persuasion with respect to the crucial factor distinguishing murder from manslaughter. In Maine, juries were instructed that if the prosecution proved that the homicide was both intentional and unlawful, the crime was to be considered murder unless the *defendant* proved by a preponderance of the evidence that he acted in the heat of passion on sudden provocation. Only if the defendant carried this burden would the offense be reduced to manslaughter.

New York's present homicide laws had their genesis in lingering dissatisfaction with certain aspects of the common-law framework that this Court confronted in *Mullaney*. Critics charged that the archaic language tended to obscure the fac-

tors of real importance in the jury's decision. Also, only a limited range of aggravations would lead to mitigation under the common-law formula, usually only those resulting from direct provocation by the victim himself. It was thought that actors whose emotions were stirred by other forms of outrageous conduct, even conduct by someone other than the ultimate victim, also should be punished as manslaughterers rather than murderers. Moreover, the common-law formula was generally applied with rather strict objectivity. Only provocations that might cause the hypothetical reasonable man to lose control could be considered. And even provocations of that sort were inadequate to reduce the crime to manslaughter if enough time had passed for the reasonable man's passions to cool, regardless of whether the actor's own thermometer had registered any decline. See generally W. LaFave & A. Scott, Criminal Law 528–530, 539–540, 571–582 (1972); Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Colum. L. Rev. 1425, 1446 (1968); ALI, Model Penal Code § 201.3, Comment (Tent. Draft No. 9, 1959); Perkins, *supra.* Cf. B. Cardozo, Law and Literature and Other Essays 99–101 (1931).

The American Law Institute took the lead in moving to remedy these difficulties. As part of its commendable undertaking to prepare a Model Penal Code, it endeavored to bring modern insights to bear on the law of homicide. The result was a proposal to replace "heat of passion" with the moderately broader concept of "extreme mental or emotional disturbance." The proposal first appeared in a tentative draft published in 1959, and it was accepted by the Institute and included as § 210.3 of the 1962 Proposed Official Draft.

At about this time the New York Legislature undertook the preparation of a new criminal code, and the Revised Penal Law of 1967 was the ultimate result. The new code adopted virtually word for word the ALI formula for distinguishing murder from manslaughter. N. Y. Penal Law §§ 125.20 (2),

125.25 (1)(a) (McKinney 1975).[1]   Under current New York law,[2] those who kill intentionally are guilty of murder.  But there is an affirmative defense left open to a defendant: If his act was committed "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse," the crime is reduced to manslaughter.  The supposed defects of a formulation like Maine's have been removed.  Some of the rigid objectivity of the common law is relieved, since reasonableness is to be determined "from the viewpoint of a person in the defendant's situation under the circum-

---

[1] There are also other forms of manslaughter set forth in the New York statute, not all of which conform to the ALI recommendations.  Those provisions are not implicated in this case.

[2] The 1967 provisions marked a considerable departure from the prior New York statutes defining manslaughter.  As we noted in *Mullaney* v. *Wilbur,* 421 U. S. 684, 694 (1975), the grounds for distinguishing murder from manslaughter developed along two distinct paths in this country. Prior to the 1967 change New York, with a handful of other jurisdictions, see ALI, Model Penal Code § 201.3, Comment, p. 43 (Tent. Draft No. 9, 1959), pursued the first path: to establish malice (and hence to convict of murder) the prosecution bore the burden of persuasion, being required to establish a substantive element of intent—that the defendant possessed "a design to effect death."  See 39 N. Y. 2d 288, 299, 347 N. E. 2d 898, 905 (1976) (case below); *Stokes* v. *People,* 53 N. Y. 164 (1873).  Maine, in contrast, followed the second path, marked out most prominently by Chief Justice Shaw's opinion in *Commonwealth* v. *York,* 50 Mass. 93 (1845): malice was presumed unless the defendant established that he acted in the heat of passion.

This difference between the old New York practice and the *York* approach was substantial—as noted by the Court of Appeals below.  But that court placed entirely too much weight on this distinction as a basis for concluding that *Mullaney*'s holding was inapplicable.  The statute at issue here is the 1967 Revised Penal Law, not the earlier formulation.  In 1967, New York broke from the first branch and aligned itself with *York,* although casting its statute in more modern language.  No matter how extensive the differences between the pre-1967 practice and the Maine statutes found deficient in *Mullaney,* this case must be decided on the basis of current New York law.

stances as the defendant believed them to be." § 125.25 (1) (a). The New York law also permits mitigation when emotional disturbance results from situations other than direct provocation by the victim. And the last traces ·of confusing archaic language have been removed. There is no mention of malice aforethought, no attempt to give a name to the state of mind that exists when extreme emotional disturbance is not present. The statute is framed in lean prose modeled after the ALI approach, giving operative descriptions of the crucial factors rather than attempting to attach the classical labels.

Despite these changes, the major factor that distinguishes murder from manslaughter in New York—"extreme emotional disturbance"—is undeniably the modern equivalent of "heat of passion." The ALI drafters made this abundantly clear. They were not rejecting the notion that some of those who kill in an emotional outburst deserve lesser punishment; they were merely refining the concept to relieve some of the problems with the classical formulation. See ALI, Model Penal Code, § 201.3, Comment, pp. 46–48 (Tent. Draft No. 9, 1959). The New York drafters left no doubt about their reliance on the ALI work. See 39 N. Y. 2d 288, 300–301, 347 N. E. 2d 898, 906 (1976). Both the majority and the dissenters in the New York Court of Appeals agreed that extreme emotional disturbance is simply "a new formulation" for the traditional language of heat of passion. *Id.*, at 301, 347 N. E. 2d, at 906; *id.*, at 312, 347 N. E. 2d, at 913–914 (Cooke, J., dissenting).

But in one important respect the New York drafters chose to parallel Maine's practice precisely, departing markedly from the ALI recommendation. Under the Model Penal Code the prosecution must prove the. absence of emotional disturbance beyond a reasonable .doubt once the issue is properly raised. See ALI, Model Penal Code §§ 1.12, 210.3 (Proposed Official Draft 1962); *id.*, § 1.13, Comment, pp. 108–118 (Tent. Draft No. 4, 1955). In New York, however, extreme emotional disturbance constitutes an affirmative defense rather

than a simple defense. Consequently the defendant bears not only the burden of production on this issue; he has the burden of persuasion as well. N. Y. Penal Law § 25.00 (McKinney 1975).

## B

*Mullaney* held invalid Maine's requirement that the defendant prove heat of passion. The Court today, without disavowing the unanimous holding of *Mullaney,* approves New York's requirement that the defendant prove extreme emotional disturbance. The Court manages to run a constitutional boundary line through the barely visible space that separates Maine's law from New York's. It does so on the basis of distinctions in language that are formalistic rather than substantive.

This result is achieved by a narrowly literal parsing of the holding in *Winship:* "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U. S., at 364. The only "facts" necessary to constitute a crime are said to be those that appear on the face of the statute as a part of the definition of the crime.[3] Maine's statute was invalid, the Court reasons, because it "defined [murder] as the unlawful killing of a human being 'with malice aforethought, either express or implied.'" *Ante,* at 212. "[M]alice," the Court reiterates, "in the sense of the absence of provocation, was part of the definition of that crime." *Ante,* at 216. *Winship* was violated only because this "fact"—malice—was "presumed" unless the defendant persuaded the jury otherwise by showing that he acted in the heat of passion.[4] New York, in form presuming

---

[3] The Court holds that the prosecution must prove beyond a reasonable doubt "all of the elements *included in the definition of the offense* of which the defendant is charged." *Ante,* at 210 (emphasis added).

[4] The Court explains: "Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be

no affirmative "fact" against Patterson,[5] and blessed with a statute drafted in the leaner language of the 20th century, escapes constitutional scrutiny unscathed even though the effect on the defendant of New York's placement of the burden of persuasion is exactly the same as Maine's. See 39 N. Y. 2d, at 312–313, 347 N. E. 2d, at 913–914 (Cooke, J., dissenting).

This explanation of the *Mullaney* holding bears little re-

---

either proved or presumed is impermissible under the Due Process Clause." *Ante,* at 215. I must point out, however, that this is a less than faithful reading of Maine law. The Maine Supreme Judicial Court, rejecting a recent holding to the contrary by the Court of Appeals for the First Circuit, emphatically insisted that the words "malice aforethought" appearing in the Maine statute did not connote a "fact" to be "presumed" in the sense the latter terms are customarily used:

"As we read the [First Circuit] case, the Federal Court was of the impression that [murder] includes, in addition to an intentional and unlawful killing, the independent element of 'malice aforethought.' Such is not, and never has been, the law in Maine. As we said in [*State* v. *Rollins,* 295 A. 2d 914, 920 (1972)]:

"'[T]he "malice" (said to be "presumed") is not a designation of any subjective state of mind existing *as a fact.* Similarly, the *"presumption"* (of "malice") arising from the fact of an intentional killing is not a designation of any *probative* relationship between the fact of "intention" relating to the killing and *any further facts* . . . .'" *State* v. *Lafferty,* 309 A. 2d 647, 664 (1973) (emphasis in original).

See *id.,* at 672 (concurring opinion); *Mullaney* v. *Wilbur,* 421 U. S., at 689, 699.

[5] "The crime of murder is defined by the [New York] statute . . . as causing the death of another person with intent to do so. The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are either presumed or inferred in order to constitute the crime. . . .

". . . [The] affirmative defense [of extreme emotional disturbance] . . . does not serve to negative any facts of the crime which the State is to prove in order to convict of murder." *Ante,* at 205–206, 206–207.

semblance to the basic rationale of that decision.[6]   But this is not the cause of greatest concern.   The test the Court today establishes allows a legislature to shift, virtually at will, the burden of persuasion with respect to any factor in a criminal case, so long as it is careful not to mention the nonexistence of that factor in the statutory language that defines the crime.   The sole requirement is that any references to the factor be confined to those sections that provide for an affirmative defense.[7]

Perhaps the Court's interpretation of *Winship* is consistent with the letter of the holding in that case.   But little of the spirit survives.   Indeed, the Court scarcely could distinguish this case from *Mullaney* without closing its eyes to the constitutional values for which *Winship* stands.   As Mr. Justice Harlan observed in *Winship,* "a standard of proof represents an attempt to instruct the factfinder concerning the degree of

---

[6] In *Mullaney* we made it clear that *Winship* is not "limited to a State's definition of the elements of a crime."   421 U. S., at 699 n. 24.

[7] Although the Court never says so explicitly, its new standards appear to be designed for application to the language of a criminal statute on its face, regardless of how the state court construes the statute.   The Court, in explaining *Mullaney,* persistently states that in Maine malice "was part of the definition of that crime [murder]," *ante,* at 216, even though the Maine Supreme Judicial Court, construing its own statute, had ruled squarely to the contrary.   See n. 4, *supra.*   In the usual case it is well established that an authoritative construction by the State's highest court "puts [appropriate] words in the statute as definitely as if it had been so amended by the legislature."   *Winters* v. *New York,* 333 U. S. 507, 514 (1948).   See *Mullaney, supra,* at 690–691; *Hebert* v. *Louisiana,* 272 U. S. 312, 316–317 (1926); *Murdock* v. *Memphis,* 20 Wall. 590, 635 (1875).   Why an apparent exception should be engrafted on that doctrine today goes unexplained.

The result, under the Court's holding, is that only the legislature can remedy any defects that come to light as a result of the Court's decision.   No matter how clear the legislative intent that defendants bear the burden of persuasion on an issue—an ultimate result the Court approves—state courts may not effectuate that intent until the right verbal formula appears in the statute book.

confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." 397 U. S., at 370 (concurring opinion). See *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958). Explaining *Mullaney,* the Court says today, in effect, that society demands full confidence before a Maine factfinder determines that heat of passion is missing—a demand so insistent that this Court invoked the Constitution to enforce it over the contrary decision by the State. But we are told that society is willing to tolerate far less confidence in New York's factual determination of precisely the same functional issue. One must ask what possibly could explain this difference in societal demands. According to the Court, it is because Maine happened to attach a name—"malice aforethought"—to the absence of heat of passion, whereas New York refrained from giving a name to the absence of extreme emotional disturbance. See 39 N. Y. 2d, at 313, 347 N. E. 2d, at 914 (Cooke, J., dissenting).

With all respect, this type of constitutional adjudication is indefensibly formalistic. A limited but significant check on possible abuses in the criminal law now becomes an exercise in arid formalities. What *Winship* and *Mullaney* had sought to teach about the limits a free society places on its procedures to safeguard the liberty of its citizens becomes a rather simplistic lesson in statutory draftsmanship. Nothing in the Court's opinion prevents a legislature from applying this new learning to many of the classical elements of the crimes it punishes.[8] It would be preferable, if the Court has found

---

[8] For example, a state statute could pass muster under the only solid standard that appears in the Court's opinion if it defined murder as mere physical contact between the defendant and the victim leading to the victim's death, but then set up an affirmative defense leaving it to the defendant to prove that he acted without culpable *mens rea.* The State, in other words, could be relieved altogether of responsibility for proving *anything* regarding the defendant's state of mind, provided only that the face of the statute meets the Court's drafting formulas.

To be sure, it is unlikely that legislatures will rewrite their criminal laws

reason to reject the rationale of *Winship* and *Mullaney*, simply and straightforwardly to overrule those precedents.

The Court understandably manifests some uneasiness that its formalistic approach will give legislatures too much latitude in shifting the burden of persuasion. And so it issues a warning that "there are obviously constitutional limits beyond which the States may not go in this regard." *Ante,* at 210. The Court thereby concedes that legislative abuses may occur and that they must be curbed by the judicial branch. But if the State is careful to conform to the drafting formulas articulated today, the constitutional limits are anything but "obvious." This decision simply leaves us without a conceptual framework for distinguishing abuses from legitimate legislative adjustments of the burden of persuasion in criminal cases.[9]

## II

It is unnecessary for the Court to retreat to a formalistic test for applying *Winship*. Careful attention to the *Mullaney* decision reveals the principles that should control in this and like cases. *Winship* held that the prosecution must bear the burden of proving beyond a reasonable doubt " 'the existence of every fact necessary to constitute the crime charged.' " 397 U. S., at 363, quoting *Davis* v. *United States,* 160 U. S. 469, 493 (1895). In *Mullaney* we concluded that heat of passion was one of the "facts" described in *Winship*—that is, a

in this extreme form. The Court seems to think this likelihood of restraint is an added reason for limiting review largely to formalistic examination. *Ante,* at 211. But it is completely foreign to this Court's responsibility for constitutional adjudication to limit the scope of judicial review because of the expectation—however reasonable—that legislative bodies will exercise appropriate restraint.

[9] I have no doubt that the Court would find some way to strike down a formalistically correct statute as egregious as the one hypothesized in n. 8, *supra.* Cf. *Morissette* v. *United States,* 342 U. S. 246, 250–263 (1952). But today's ruling suggests no principled basis for concluding that such a statute falls outside the "obvious" constitutional limits the Court invokes.

factor as to which the prosecution must bear the burden of persuasion beyond a reasonable doubt. 421 U. S., at 704. We reached that result only after making two careful inquiries. First, we noted that the presence or absence of heat of passion made a substantial difference in punishment of the offender and in the stigma associated with the conviction. *Id.*, at 697–701. Second, we reviewed the history, in England and this country, of the factor at issue. *Id.*, at 692–696. Central to the holding in *Mullaney* was our conclusion that heat of passion "has been, almost from the inception of the common law of homicide, the single most important factor in determining the degree of culpability attaching to an unlawful homicide." *Id.*, at 696.

Implicit in these two inquiries are the principles that should govern this case. The Due Process Clause requires that the prosecutor bear the burden of persuasion beyond a reasonable doubt only if the factor at issue makes a substantial difference in punishment and stigma. The requirement of course applies *a fortiori* if the factor makes the difference between guilt and innocence. But a substantial difference in punishment alone is not enough. It also must be shown that in the Anglo-American legal tradition [10] the factor in question historically has held that level of importance.[11] If either branch

---

[10] Cf. *Brinegar* v. *United States,* 338 U. S. 160, 174 (1949):

"Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property."

[11] As the Court acknowledges, *ante,* at 207–208, n. 10, the clear trend over the years has been to require the prosecutor to carry the burden of persuasion with respect to all important factors in a criminal case, including traditional affirmative defenses. See W. LaFave & A. Scott, Criminal Law 50 (1972); C. McCormick, Evidence § 341, pp. 800–802 (1972).

of the test is not met, then the legislature retains its traditional authority over matters of proof. But to permit a shift in the burden of persuasion when both branches of this test are satisfied would invite the undermining of the presumption of innocence, "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' " *In re Winship,* 397 U. S., at 363, quoting from *Coffin* v. *United States,* 156 U. S. 432, 453 (1895). See *Cool* v. *United States,* 409 U. S. 100, 104 (1972); *Ivan V.* v. *City of New York,* 407 U. S. 203, 204 (1972); *Lego* v. *Twomey,* 404 U. S. 477, 486–487 (1972); *Morissette* v. *United States,* 342 U. S. 246, 275 (1952); *Bailey* v. *Alabama,* 219 U. S. 219, 236 (1911); *Davis* v. *United States, supra.* This is not a test that rests on empty form, for *"Winship* is concerned with substance rather than . . . formalism." *Mullaney* v. *Wilbur,* 421 U. S., at 699.

I hardly need add that New York's provisions allocating the burden of persuasion as to "extreme emotional disturbance" are unconstitutional when judged by these standards. "Extreme emotional disturbance" is, as the Court of Appeals recognized, the direct descendant of the "heat of passion" factor considered at length in *Mullaney.* I recognize, of course, that the differences between Maine and New York law are not unimportant to the defendant; there is a somewhat broader opportunity for mitigation. But none of those distinctions is relevant here. The presence or absence of extreme emotional disturbance makes a critical difference in punishment and stigma, and throughout our history the resolution of this issue of fact, although expressed in somewhat different terms, has distinguished manslaughter from murder. See 4 W. Blackstone, Commentaries *190–193, 198–201.

## III

The Court beats its retreat from *Winship* apparently because of a concern that otherwise the federal judiciary will in-

trude too far into substantive choices concerning the content of a State's criminal law.[12] The concern is legitimate, see generally *Powell* v. *Texas,* 392 U. S. 514, 533–534 (1968) (plurality opinion); *Leland* v. *Oregon,* 343 U. S. 790, 803 (1952) (Frankfurter, J., dissenting), but misplaced. *Winship* and *Mullaney* are no more than what they purport to be: decisions addressing the procedural requirements that States must meet to comply with due process. They are not outposts for policing the substantive boundaries of the criminal law.

The *Winship/Mullaney* test identifies those factors of such importance, historically, in determining punishment and stigma that the Constitution forbids shifting to the defendant the burden of persuasion when such a factor is at issue. *Winship* and *Mullaney* specify only the procedure that is required when a State elects to use such a factor as part of its substantive criminal law. They do not say that the State must elect to use it. For example, where a State has chosen to retain the traditional distinction between murder and manslaughter, as have New York and Maine, the burden of persuasion must remain on the prosecution with respect to the distinguishing factor, in view of its decisive historical importance. But nothing in *Mullaney* or *Winship* precludes a State from abolishing the distinction between murder and manslaughter and treating all unjustifiable homicide as murder.[13] In this sig-

---

[12] See Low & Jeffries, DICTA: Constitutionalizing the Criminal Law?, 29 Va. Law Weekly, No. 18, p. 1 (1977); Tushnet, Constitutional Limitation of Substantive Criminal Law: An Examination of the Meaning of *Mullaney* v. *Wilbur,* 55 B. U. L. Rev. 775 (1975).

[13] Perhaps under other principles of due process jurisprudence, certain factors are so fundamental that a State could not, as a substantive matter, refrain from recognizing them so long as it chooses to punish given conduct as a crime. Cf. *Bailey* v. *Alabama,* 219 U. S. 219 (1911) (holding a criminal-law presumption invalid procedurally and also finding a substantive defect under the Thirteenth Amendment and the Anti-Peonage Act). But substantive limits were not at issue in *Winship* or *Mullaney,* and they are not at issue here.

Even if there are no constitutional limits preventing the State, for

nificant respect, neither *Winship* nor *Mullaney* eliminates the substantive flexibility that should remain in legislative hands.

Moreover, it is unlikely that more than a few factors—although important ones—for which a shift in the burden of persuasion seriously would be considered will come within the *Mullaney* holding. With some exceptions, then, the State has the authority "to recognize a factor that mitigates the degree of criminality or punishment" without having "to prove its nonexistence in each case in which the fact is put in issue." *Ante*, at 209. New ameliorative affirmative defenses,[14] about

---

example, from treating all homicides as murders punishable equally regardless of mitigating factors like heat of passion or extreme emotional disturbance, the *Winship/Mullaney* rule still plays an important role. The State is then obliged to make its choices concerning the substantive content of its criminal laws with full awareness of the consequences, unable to mask substantive policy choices by shifts in the burden of persuasion. See Fletcher, Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases, 77 Yale L. J. 880, 894 (1968) ("The burden of persuasion has proved to be a subtle, low-visibility tool for adjusting the interests of competing classes of litigants"). The political check on potentially harsh legislative action is then more likely to operate. Cf. *Tot* v. *United States*, 319 U. S. 463, 472 (1943); *United States* v. *Romano*, 382 U. S. 136 (1965).

*Romano* involved a challenge to a federal statute that authorized the jury to infer possession, custody, and control of an illegal still from mere presence at the site. The Government contended that the statute should be sustained since it was merely Congress' way of broadening the substantive provisions in order to make a crime of mere presence. The Court rejected this argument, serving notice that Congress could not work a substantive change of that magnitude in such a disguised form. *Id.*, at 144. See Ashford & Risinger, Presumptions, Assumptions, and Due Process in Criminal Cases: A Theoretical Overview, 79 Yale L. J. 165, 177–178 (1969); Osenbaugh, The Constitutionality of Affirmative Defenses to Criminal Charges, 29 Ark. L. Rev. 429, 461 (1976).

[14] Numerous examples of such defenses are available: New York subjects an armed robber to lesser punishment than he would otherwise receive if he proves by a preponderance of the evidence that the gun he used was unloaded or inoperative. N. Y. Penal Law § 160.15 (McKinney 1975). A number of States have ameliorated the usual operation of statutes

which the Court expresses concern, generally remain undisturbed by the holdings in *Winship* and *Mullaney*—and need not be disturbed by a sound holding reversing Patterson's conviction.[15]

Furthermore, as we indicated in *Mullaney*, 421 U. S., at 701–702, n. 28, even as to those factors upon which the prosecution must bear the burden of persuasion, the State retains an important procedural device to avoid jury confusion and prevent the prosecution from being unduly hampered. The State normally may shift to the defendant the burden of production,[16] that is, the burden of going forward with sufficient

---

punishing statutory rape, recognizing a defense if the defendant shows that he reasonably believed his partner was of age. *E. g.*, Ky. Rev. Stat. Ann. §§ 500.070, 510.030 (1975); Wash. Rev. Code Ann. § 9.79.160 (2) (Supp. 1975). Formerly the age of the minor was a strict-liability element of the crime. The Model Penal Code also employs such a shift in the burden of persuasion for a limited number of defenses. For example, a corporation can escape conviction of an offense if it proves by a preponderance of the evidence that the responsible supervising officer exercised due diligence to prevent the commission of the offense. § 2.07 (5) (Proposed Official Draft 1962).

[15] A number of commentators have suggested that the Constitution permits the States some latitude in adjusting the burden of persuasion with respect to new ameliorative affirmative defenses that result from legislative compromise, but not with respect to other factors. See, *e. g.*, W. LaFave & A. Scott, *supra*, n. 11, at 49; 1 National Commission on Reform of Federal Criminal Laws, Working Papers 18–19 (1970); ALI, Model Penal Code § 1.13, Comment, p. 113 (Tent. Draft No. 4, 1955) (quoted, *ante*, at 209 n. 11); Note, 51 Wash. L. Rev. 953, 964 (1976); Osenbaugh, *supra*, n. 13, at 459–467. Cf. Fletcher, *supra*, n. 13, at 928–929.

[16] There are outer limits on shifting the burden of production to a defendant, limits articulated in a long line of cases in this Court passing on the validity of presumptions. Most important are the "rational connection" requirement of *Mobile, J. & K. C. R. Co.* v. *Turnipseed*, 219 U. S. 35, 43 (1910), and *Bailey* v. *Alabama*, *supra*, at 238–239, and also the "comparative convenience" criterion of *Morrison* v. *California*,

evidence "to justify [a reasonable] doubt upon the issue." [17] ALI, Model Penal Code § 1.13, Comment, p. 110 (Tent. Draft No. 4, 1955). If the defendant's evidence does not cross this threshold, the issue—be it malice, extreme emotional disturbance, self-defense, or whatever—will not be submitted to the jury.[18] See *Sansone* v. *United States*, 380 U. S. 343, 349 (1965); *Stevenson* v. *United States*, 162 U. S. 313, 314–316 (1896). Ever since this Court's decision in *Davis* v. *United States*, 160 U. S. 469 (1895), federal prosecutors have borne the burden of persuasion with respect to factors like insanity, self-defense, and malice or provocation, once the defendant has carried this burden of production. See, *e. g.*, *Blake* v. *United States*, 407 F. 2d 908, 910–911 (CA5 1969) (en banc) (insanity); *Frank* v. *United States*, 42 F. 2d 623, 629 (CA9 1930) (self-defense); *United States* v. *Alexander*, 152 U. S. App. D. C. 371, 389–395, 471 F. 2d 923, 941–947, cert. denied *sub nom. Murdock* v. *United States*, 409 U. S. 1044 (1972) (provocation). I know of no indication that this

---

291 U. S. 82 (1934). See also, *e. g.*, *Tot* v. *United States, supra*, at 467–468; *Speiser* v. *Randall*, 357 U. S. 513, 523–524 (1958); *Leary* v. *United States*, 395 U. S. 6, 33–34 (1969); *Barnes* v. *United States*, 412 U. S. 837, 843 (1973). Caution is appropriate, however, in generalizing about the application of any of these cases to a given procedural device, since the term "presumption" covers a broad range of procedural mechanisms having significantly different consequences for the defendant. See McCormick, n. 11, *supra*, at 802–806; *Evans* v. *State*, 28 Md. App. 640, 675–678, 349 A. 2d 300, 324–325 (1975).

[17] This does not mean that the defendant must introduce evidence in every case. In some instances the prosecution's case may contain sufficient evidence in support of the defendant's position to generate a jury issue.

[18] On many occasions this Court has sustained a trial court's refusal to submit an issue to the jury in a criminal case when the defendant failed to meet his burden of production. See, *e. g.*, *Sparf* v. *United States*, 156 U. S. 51, 63–64 (1895); *Andersen* v. *United States*, 170 U. S. 481, 510–511 (1898); *Battle* v. *United States*, 209 U. S. 36, 38 (1908). Cf. *Galloway* v. *United States*, 319 U. S. 372, 395 (1943).

practice has proven a noticeable handicap to effective law enforcement.[19]

To be sure, there will be many instances when the *Winship/Mullaney* test as I perceive it will be more difficult to apply than the Court's formula. Where I see the need for a careful and discriminating review of history, the Court finds a bright-line standard that can be applied with a quick glance at the face of the statute. But this facile test invites tinkering with the procedural safeguards of the presumption of innocence, an invitation to disregard the principles of *Winship* that I would not extend.

---

[19] Dean McCormick emphasized that the burden of production is "a critical and important mechanism in a jury trial." In his view, "this mechanism has far more influence upon the final outcome of cases than does the burden of persuasion, which has become very largely a matter of the technique of the wording of instructions to juries." C. McCormick, Evidence § 307, pp. 638–639, and n. 2 (1st ed. 1954). Cf. Fletcher, *supra*, n. 13, at 930.